IRA CONGER, Appellee, v. ORVILLE LEE, Appellant.

**CONTRACTS:** Rescission—Evidence. Evidence reviewed, and held
1  not to amount (a) to a rescission of a contract by plaintiff, or (b) to a repudiation by defendant.

**CONTRACTS:** Conditions—Evidence. Evidence reviewed, and held
2  sufficient to sustain a finding by the jury that a sale of corporate stock was not on the condition that certain other stock belonging to other parties should be retired.

**FRAUDS, STATUTE OF:** Sale of Personal Property—Performance—
3  Effect. A contract for the sale of corporate stock fully performed by the vendor is not within the statute of frauds.

*Appeal from Sac District Court.*—E. G. ALBERT, Judge.

FRIDAY, APRIL 7, 1916.

ACTION upon an oral contract alleged to have been fully performed by the plaintiff, whereby the defendant agreed to pay the plaintiff the sum of $4,348.23. The defense was a

general denial. There was a trial to a jury and a verdict for the plaintiff for the amount sued for, and a judgment entered thereon. The defendant has appealed.—*Affirmed.*

*Elwood & Tourgee* and *Faville & Whitney,* for appellant.

*R. L. McCord* and *W. A. Helsell,* for appellee.

EVANS, C. J.—The chief controversy in the case is over a question of fact. At the close of the evidence, the defendant moved for a directed verdict, on the general ground that the plaintiff had failed to prove the alleged contract and had failed to prove performance of any alleged contract on his own part. This question is extensively discussed in the briefs, and involves the consideration of a considerable record. The parties were residents of Sac City. The subject matter of the contract had to do with the interest of the plaintiff in the Conger-Ball Company, a corporation doing business at Sac City. This company was originally capitalized at $34,000, divided into stock shares of $100 each. The plaintiff owned 231 shares thereof; W. A. Ball, 59 shares; and Laverne Lee, a son of the defendant, 50 shares. This company engaged in two separate lines or departments of business. The one is known in the record as the "elevator business," and the other as the "seed business." Prior to the transaction here involved, they had sold out the elevator business, but still retained the seed business. They had not changed the form of their capitalization.

The claim of the plaintiff is that he undertook to sell to defendant his interest in the seed business, which was still being carried on by the company. The active management of this business was conducted by Ball and Laverne Lee, the plaintiff having recently removed to California. The evidence for the plaintiff tended to show that the parties agreed upon a basis of valuation of plaintiff's so-called interest in the seed business, by ascertaining the value of the assets pertaining to such department. A total valuation of such assets was

agreed upon at $8,000. The par value of plaintiff's interest, therefore, was taken to be 231/340 of $8,000, or about $5,433. The defendant agreed to pay the plaintiff 80% of such estimated par value, and this is the amount sued for. There were some apparent complications involved in the negotiations; that is to say, the evidence as to some details is somewhat confusing to a stranger to the record. Conger was indebted to the corporation for something upwards of $20,000, subject, however, to certain prospective offsets or credits. The price to be paid by the defendant was to be so paid to Ball, and was to be applied by Ball upon the plaintiff's indebtedness. The plaintiff was to execute to the corporation his promissory note for the balance due from him as soon as such balance was ascertained. The negotiations between plaintiff and defendant were carried on in the presence of and in consultation with both Ball and Laverne Lee. The defendant's final offer and his agreement upon the valuation of $8,000 was communicated to the plaintiff through Ball, and was accepted by the plaintiff by communication to Ball. The delivery of plaintiff's stock was to be made to Ball. Ball was also to prepare and send to plaintiff in California a full statement of his account with the corporation, so that the amount of the note to be executed by plaintiff could be determined therefrom.

Among the assets of the corporation were about $1,400 of accounts and notes, which were of more or less doubtful value. The plaintiff had agreed to assume the payment of these notes and accounts himself and to look to the debtors for reimbursement. The negotiations between the parties up to this point were had at Sac City, in October, 1913. Within a few days, the plaintiff departed for his home in California. Later, he received from Ball, by mail, a statement of his account, which carried an item of credit of $4,348.26 as the value of "Seed Dept. stock @ 80¢." This statement showed a balance due to the corporation from plaintiff of something over $4,900. The plaintiff sent to Ball by mail his promissory note for such amount, and sent to him all his stock

endorsed in blank. This was done in November, 1913. Just before this was done, some correspondence ensued between the parties which will be referred to later, and upon which each party relies as furnishing support to his own theory. We think that, at the time of the departure of the plaintiff, the evidence is abundant to justify a finding that the parties had reached an agreement along the lines herein indicated. The following excerpts from the evidence on behalf of plaintiff will be sufficient indication of the details of the testimony. Ball testified as follows:

"I am the Ball represented in Conger-Ball & Company. I was secretary and manager. Mr. Conger, Mr. Laverne Lee and myself are the persons who were interested in that company prior to October 1, 1913. I had a conversation with Mr. Orville Lee in regard to going over the books of the Conger-Ball & Company to ascertain the then value of its property. I had an appointment to meet Mr. Lee and Mr. Conger up at the office one evening and I think Mr. Conger asked me to come. We all met there. At that time the question of Mr. Lee's buying the interest of Mr. Conger in that institution was gone over more or less. Afterwards Mr. Lee and I figured up the then value of the Conger-Ball & Company property. I think we met there twice. Mr. Lee and I met there together at another time. I figured that the said business was worth $8,000. Mr. Conger owned 231/340 of it. Mr. Lee told me to offer 80c on the dollar for the stock. I communicated this statement of Mr. Lee's to Mr. Conger. Mr. Conger thought it was pretty cheap but he says: 'I am going to be away and I am going to sell it.' I communicated Mr. Conger's answer to Mr. Lee. I can't tell you exactly what Mr. Lee said. I cannot give the exact wording but in substance he said that was satisfactory to him. When we all met there together it was suggested by Mr. Conger or Mr. Lee, I don't remember which, that the certificates when they were sent back, they were to be sent to me for transfer. Mr. Lee was present and that was agreed upon. I do not know who

suggested it. There was something said as to what ought to be done with certain old accounts and notes. There were certain accounts that were doubtful, that were to be charged up to Mr. Conger's account. They were charged up to Mr. Conger's account. Mr. Conger has paid that. I have seen Exhibit 'A' before. It is a statement of Mr. Conger's account as it appeared on the books of the company at that time. I sent the statement of account to Mr. Conger. Before sending it I submitted it to Mr. Lee. Mr. Lee said: 'I think that is the way we figured it.' I received from Mr. Conger his certificates evidencing his interest in this business. After I received them I called Mr. Lee's attention to the same. Mr. Lee looked at them. He did not say anything. Q. I mean this, Mr. Ball. Your evidence shows that the value of the concern was only $8,000 and the original stock was worth $34,000. Now in these conversations and in these deals with Mr. Lee, did you have any talk as to what was to be done with this stock, if anything, in order to make the stock the same as the actual value of the business? A. The stock was to be retired; all but the amount represented by the seed department. Previous to the time I received the stock, Mr. Lee came to the office and took out his check book and offered to pay for it. He offered to give his check for the amount. Well, he came in and said: 'Well, I guess I had better give you a check for that stock, hadn't I?' I said, 'You can if you wish,' and he got his check book out and pencil and was ready to write the check and he turned around and says: 'Has the stock come yet?' And I says: 'No, it hasn't.' And he said: 'Maybe I better wait until it comes.' After this transaction until Mr. Conger went to California, Mr. Lee come up to where the office was quite often. After I received the stock from Mr. Conger I talked with Mr. Lee once. We talked about the business whenever he came in just a general way. There was one particular transaction that I called to him for advice. This company was engaged in two branches of business. One we called the 'seed business' and one the 'grain

business.' The first talk I had with Mr. Lee about taking an interest in the business was at the seed house. It was, I should judge, about the first of October, 1913. Mr. Conger was present at the time. I think we met there twice. I am not sure. We met there two or three times. I wouldn't be sure which, twice anyhow. At the first meeting, Mr. Conger, Mr. Laverne Lee and Mr. Lee and myself were present. That was about the first of October. The next meeting was possibly the next night or the night after, I wouldn't be sure. The same parties were present. There was talk at these meetings about Mr. Lee buying Mr. Conger's stock. It was my understanding that Mr. Lee's proposed purchase of the stock was based on a proposition or idea that the stock was to be reduced to a total of only $8,000. That was the talk. Not that Conger's stock alone was to be $8,000 but that the total stock of the company was to be reduced from $34,000 to $8,000. Mr. Lee was not to pay eighty per cent. of the whole $8,000. I had $5,900 worth of stock and Laverne Lee had $5,000 worth of stock and Mr. Conger had $23,100 worth of stock. The talk was that after the total stock was reduced to $8,000, Mr. Conger's interest would be 231/340 of $8,000, and that would be about $5,433. It was talked of 80c on the dollar on a basis of $5,400, Conger's share, and on the assumption and on the basis that the entire stock of the company was reduced so that our total outstanding capital would be only $8,000. That was Mr. Lee's proposition that after all that was done he would consider an offer of 80c on the dollar or something like that, for Conger's stock. That was the general talk. Mr. Conger's stock was in there. My stock was there and Laverne Lee's stock was there in the safe. We never had a conference of all of us together after these two talks in the evening. Conger left for California possibly a week after. I wouldn't be sure just how soon. In the meantime there was no conference in which all were present. Mr. Conger went to California about that time. I sent him this statement that has been identified here. I accompanied it with a letter. I received a letter

from Mr. Conger along in the forepart of November. I had
some correspondence with Mr. Conger as I testified on direct
examination. I received a letter from him. After Mr. Conger
had gone to California I had a talk with Mr. Lee. He was in
a number of times. I testified that he was in and offered to
pay for the stock. I don't know that I had a talk with Mr.
Lee before that. I don't remember that I had a talk with him
after that. I did show him a letter I received from Mr. Conger
at one of those times. That was along the latter part of Octo-
ber. I showed him the letter. I have that letter with me.
I had a talk with Mr. Lee after Mr. Conger went away. It
was shortly after he had gone in October. I cannot remember
any further conversation. I know that Mr. Lee was in a
number of times and we talked about it a little. I don't know
whether this matter came up,—I wouldn't say that it did;
but we had conversations during that time, but what they
were over I could not say. I don't know whether they were
about this deal or not at that time, we had talks later.
Between the time Conger went away and before I got the stock
back I showed to Mr. Lee a letter which I have produced here
now and which is identified by the reporter as Exhibit '3.' I
cannot give you the date. I said in my direct examination
that Mr. Lee took part in figuring up. At first there was
Mr. Conger, Mr. Lee, and Mr. Laverne Lee and myself pres-
ent. That was the first two meetings and then Mr. Lee and
I met together. Those two meetings were the meetings at the
seed house in which the four of us were present. I do not
mean that Mr. Lee helped make up this statement which I
identified on direct examination as being the one sent to Mr.
Conger. I prepared it but I took the figures that he and I
had both made. I prepared it finally after those two meetings.
Conger was there when we made those figures. So that Conger
and Lee and Laverne Lee and myself made those figures.
There was a number of different figures and before we arrived
at what we considered to be correct and right, and this was
after Mr. Conger had gone that I took the figures and con-

densed them. These are the same identical figures, but we
had a number of different figures there. We had been figuring
it over three or four times from different angles. It was
figured that way. It was figured in different ways, I don't
know just how many. At least three different ways. And
after that Mr. Conger went away and didn't do any more
with the figuring. The time I testified about that Mr. Lee
took out his check book, I am not sure who was present.
I think the bookkeeper was present, Miss Roose. Nobody else
that I remember of. I don't know whether Laverne Lee was
there or not. I couldn't say how long that was after the
two different meetings at which the four of us were present.
It was just a few days before I received this letter from Mr.
Conger. It was not before I sent this statement to Mr. Conger.
It was after that. I don't know just when it was. It must
have been just a day or two later. It was at the seed house
office. Well, he came in, and he says: 'I guess I had better
give you a check for stock, hadn't I?' and I said, 'You
can if you wish,' and he had his check book out and his pencil
and he says: 'Has the stock come?' and I says, 'It hasn't.'
And he says: 'Maybe I better wait until it comes.'. I showed
this statement to Mr. Lee before I sent it to Mr. Conger.
I don't remember of anyone being present at this talk. I
think it happened in the office, I am not sure. It was shortly
after the two talks of the evening associations of the four of
us. Well, I don't know, as soon as Mr. Conger—as soon as
this deal was settled I made up this statement. I don't know
how long it was after the last talk of the four of us before
I showed the statement to Mr. Lee. I cannot say positively
that it was in the office or not. It must have been very shortly
before we had the talk about the check book. * * * Mr.
Conger didn't take part in the figuring as to the value of
the seed business. Mr. Lee and myself did the figuring.
We did some of the figuring while Mr. Conger was not present.
That was after the two meetings about which I have testified.

It was at this meeting that Mr. Lee told me to submit the eighty per cent. proposition to Mr. Conger. The seed business of the Conger-Ball & Company was a side issue and kept separate. We kept a separate set of books. The other business of the Conger-Ball & Company had been practically disposed of. What we actually figured was the value of the seed business alone. That is, to get this $8,000, I mean. We arrived at the conclusion that the fair value of the seed business was $8,000. Mr. Conger owned of that seed business 231/340. Mr. Lee was to get Mr. Conger's interest in that business. Q. What was to become of the rest of the stock of Mr. Conger? A. That was to be retired.''

While the defendant, as a witness, contended that the terms of the agreement were different from those testified to by the plaintiff and by Ball, his own testimony shows that he did understand that he had reached an agreement with the plaintiff. This is sufficiently indicated by the following excerpts from his testimony:

''I was buying Mr. Conger's stock which represented his interest in the seed business. I was not suggesting that I pay eighty cents on the dollar for all of Mr. Conger's stock.

''Mr. Ball told me that Mr. Conger had agreed with him if he could not get a better bid out of me than the 80 per cent. to sell it to me at that price. That was the basis we had talked about. I supposed he was satisfied and agreed to it before he left, because Mr. Ball told me that he was.

''Q. Whatever seems to have been the transaction, you did offer and agree to pay eighty cents on the dollar for Mr. Conger's interest? A. Yes, sir.''

The defendant contends, however, that the subsequent correspondence between the parties, shortly after the plaintiff left for California, completely negatives the claim that the minds of the parties had ever met. We now turn to such correspondence. On October 21st, Ball mailed to the plaintiff the following letter:

"Sac City, Iowa, Oct. 21, 1913.

"Ira Conger, Fresno, Cal.

"Dear sir:—

"You will find enclosed figures on our deal here with a list of the accounts and notes charged to your account and note for balance. We thought this would be the best way to handle it as it is all cleaned up and off the books. I have had this made out for some time but was waiting to get Orville's approval and have just been able to get hold of him. Transfer the amount of your seed stock, $5,435.33, to Orville and the balance to the Company. We are having some cold weather the past few days and think there will be no trouble in selling all the seed corn we have. Only wish we had more good corn.

"Yours truly,

"W. A. Ball."

Before receiving this letter, and on October 22nd, the plaintiff wrote to Ball the following letter:

"Fresno, Cal. 10-22-13.

"W. A. Ball, Sac City, Iowa.

"Dear Mr. Ball:—

"I arrived home in due season and have heard nothing from you in regard to the seed house settlement, and presume you have been busy getting it in shape. I think if it shows 8,600 or more on the books that it should be taken at book value where it is to be discounted 20%. Ask Mr. Lee if I am not correct. When you write, wish you would send me a copy of the 1913 invoice. Nothing new here that would interest an easterner. Have their corn all picked and nothing to do but to get ready to sow their grain which will be done next month. Hope you got in a nice bunch of corn.

"Yours truly,

"Ira Conger."

On November 7th, the defendant wrote to plaintiff the following letter:

"Nov. 7, 1913.

"Ira Conger: My dear sir and friend:—

"Mr. Ball has shown me your letter in which you seem not to be satisfied with the arrangement as it had been talked and in which I supposed you were agreed before you left here. This will not disappoint me in the least and now that you express dissatisfaction, I would much rather have nothing to do further in the matter. While the price may seem low, I still can see that while I invested $5,000 less than two years ago, and have never had a cent of return, it has now been reported to be worth only about $2,900 as shown by the July invoice. This isn't making money very rapidly and in my judgment it will take a lot of good intelligent hustling to make the business pay a dividend under the present condition. I am sure the boys will be glad to receive any suggestions from ·you as regards the future policy and operation of the business.

"Very resp't. &c,

"Orville Lee."

On November 12th, the plaintiff wrote to Ball and to the defendant the two following letters respectively:

"Fresno, Cal. Nov. 12, 1913.

"W. A. Ball, Sac City, Iowa.

"Dear sir:—

"I have yours of the 8th, also one from Mr. Lee. I don't see how Orville could have taken my letter as he did, as I considered the deal closed, but as we both had talked about wanting to be fair, I wanted to be sure he understood how that $600 was and did not know as he understood that it was added to the property after the elevators were sold, and as I understood it, out of the earnings of the business.

"When we had our last meeting I felt sure I would see you and also Mr. Lee before leaving, and if I had I should have found out about some of these things at that time, but

as I could not see you again without staying over another day and did not think it was any use, for anything I could think of at that time.

"I have written Orville and think I have made myself plain, and do not want you or Mr. Lee to think I was dissatisfied and believe when you stop to think, that it was not strange that I should ask a few questions about the business figures as long as you folks did all the figuring.

"I am enclosing the note and stock. I have signed the stock in blank, so you can handle it as you may see fit.

"Yours truly,

"Ira Conger."

"Fresno, Cal. Nov. 12, 1913.

"Orville Lee, Sac City, Iowa.

"Dear Mr. Lee:—

"Yours of the 7th at hand, and sorry my letter gave you the idea I was dissatisfied, as I did not intend it that way, and if this deal could all been figured out while I was there, I would not have been obliged to have written any letters, which you know is hard to convey just what you want to.

"Now when I got the statement and note, as well as a long list of worthless accounts, I thought about the little conversation we had, when we both said we wanted to be fair, and so I wrote Mr. Ball to ask you about the $600 that had been added to the property, as I understood it, since we had sold the elevators. And as errors and omissions are always allowable, did not want anything like that omitted, if you thought I should have it. Now that I know, I am sending the note, and stock to Mr. Ball, and do not believe that you think it so very strange that I should ask one question as long as you and Mr. Ball did all the figuring.

"I trust this little explanation will put you right as to my reason for writing to Mr. Ball as I did.

"Yours truly,

"Ira Conger."

No reply was ever made by defendant to plaintiff's letter of November 12th. For a year thereafter, the defendant gave substantial assistance in the management of the business at Sac City. The plaintiff assumed no further connection with the business after such letter, nor was he consulted concerning the same. During the ensuing year, a large business was transacted and large obligations were incurred for the corporation at the bank, amounting to about $35,000. The notes of the corporation to the bank for such indebtedness were all guaranteed by Ball and the defendant and his son. No objection appears ever to have been made as to the method of actual performance of the contract by plaintiff. None of the papers were returned or objected to. The defendant knew that they had been sent to Ball in purported compliance with the contract. The plaintiff paid his note for the alleged balance due. He paid also the full amount of the notes and accounts assumed by him. Before bringing this suit, he paid also to the corporation the amount still due from him by reason of the failure of the defendant to pay the amount involved herein.

I. It is the contention of the defendant in argument that, by his letter of October 22nd, the plaintiff repudiated the previous agreement, if any, by his alleged counter-proposition. If this be correct, it is contended that such letter had the effect to open the door of rescission or repudiation to the defendant, and that the defendant availed himself of that privilege by his letter of November 7th. It is contended that, by such letter of November 7th, the defendant "threw up the deal." Passing the question whether the plaintiff's letter of October 22nd amounted to a counter-proposition, we do not think that the defendant's letter of November 7th had the effect to rescind or repudiate the deal. The particular part of the letter upon which defendant relies at this point is as follows:

1. CONTRACTS: rescission: evidence.

"This will not disappoint me in the least, and now that

you express dissatisfaction, I *would much rather* have nothing further to do in the matter.''

This falls clearly short of *refusing* to have anything further to do in the matter. The most that can be said for it is that it opened the door of release to the plaintiff and expressed a preference to that end.

Indeed, under the issues made by the pleadings, it is doubtful whether these letters could be considered at all for the purpose of affirmative repudiation, even if their language were capable of such construction. The issues were made by general denial. The letters are competent and proper as bearing upon the question of whether these parties had previously agreed. This letter of the defendant recites his understanding that there was an agreement before the plaintiff left Sac City. Indeed, the *subsequent* conduct of the parties after this correspondence is not consistent with any other view than that they had agreed. The silence of the defendant after receiving the letter of November 12th, knowing that the plaintiff had sent on his stock to Ball for delivery and surrender in purported performance of his contract, was itself an acquiescence on his part in what had been done; at least it was a circumstance of great weight and was entitled to the consideration of the jury. We are clear, therefore, that the trial court did not err in refusing to direct a verdict for the defendant.

II.   It is the further contention of the defendant that the contract sued on was subject to a condition precedent, to the effect that all the stock of the corporation in excess of the sum of $8,000 was to be retired, and that the contract was not to go into effect until after such retiring of the excess stock. The question thus raised was submitted by the trial court to the jury. The defendant urges, however, that the evidence in support of his contention at this point was conclusive, and that it was decisive of the case as a matter of law. We do not deem the

2. CONTRACTS: conditions: evidence.

evidence by any means conclusive at this point. The defendant testified in support of the contention. The plaintiff and Ball as witnesses also conceded that there was something said at the time of the negotiations about retiring the excess stock. But they did not concede that Conger assumed to retire the stock in any other sense than in the surrender of his own. In considering this testimony, it is to be remembered that the negotiations between Conger and Lee, so far as they were personal, were had in the presence of the other two stockholders. The transaction contemplated future co-operation between Lee and his son and Ball in the future management of the company. Ball was the general manager of the corporation. Lee made him his agent, through whom he made his final offer to Conger and through whom he received the acceptance from Conger. The evidence justified a finding that the delivery of the stock by Conger was to be made to Ball. At the same time, Conger was to deliver his note to Ball for balance due the corporation. Ball was acting in the dual capacity of agent for the corporation and the agent for Lee. Such dual relation was entirely consistent. The claim that Conger was to retire all the excess stock as a condition precedent to a completed sale is quite inconsistent with other facts which are undisputed or well proven. Conger had no control over the stock of defendant's son or over the stock of Ball, and could not retire the same if he wished to. Indeed, being absent from the state, he could retire his own stock only in the sense that he could surrender the same to the proper officer of the corporation. He did surrender all his certificates endorsed in blank to Ball, who was not only the general manager of the corporation but was its secretary and treasurer, and also, as before said, the agent of Lee. His letter transmitting the same advised that he was endorsing the same in blank, "so you can handle it as you may see fit." The defendant, however, lays special stress upon an allegation in the original petition which the plaintiff in the course of the

trial withdrew by amendment, and which the defendant thereupon introduced in evidence. Such allegation was the following:

"The plaintiff further says that he sold and delivered that amount of his stock to the defendant for the agreed price of $4,348.23, under a further agreement that the rest of his stock should be surrendered to the corporation to be cancelled and retired, (so that, after this arrangement, the outstanding stock, at par value, would only equal the real value of the assets of the corporation)."

It is urged that this allegation, having been made in a verified petition, is conclusive proof upon the plaintiff, and that the fact contended for is thereby established. It may be conceded that this allegation in the original verified petition is entitled to great weight as evidence, but it is well settled that it is not conclusive. But we think the allegation itself, if taken as true, does not in its terms sustain the contention of the defendant. Under this allegation, the plaintiff undertook that the rest of his stock "*should be surrendered to the corporation* to be cancelled and retired." He did *surrender* the same, and for the very purpose herein indicated. The fact that particular shares were not segregated from the particular shares which were to be received by Lee was not of itself a breach of the contract nor a failure of performance. The manifest contemplation of the contract, as claimed by the plaintiff, was that the delivery of all shares should be to Ball for this very purpose. Ball and Lee and the son were acting together harmoniously and were all intending to be actively connected with the business, and they were actively connected therewith thereafter. The delivery by Conger to Ball was done in purported performance of the contract, and not as a purported tender. Lee knew it both from Ball and from Conger. He was so advised by Conger's letter of November 12th. Yet he made no objection and raised no question for a period of nearly one year, and after the completion of a season of business.

Treating the contention of defendant at this point as a question of fact, all these circumstances were proper for the consideration of the jury and tended strongly to support the adverse finding.

III.   It is contended for the defendant that the contract as contended for by the plaintiff was within the statute of frauds.   Objections along this line were made to the evidence throughout the trial, and the point is now pressed upon our attention.   If the plaintiff were suing upon a contract wholly executory, there might be some ground for this contention.   But the plaintiff alleged full performance of the contract on his part.   His evidence was sufficient to justify a finding of such full performance.   He could not have recovered at all under the issues without a finding of such full performance on his part.   This of itself necessarily disposes of any question of the statute of frauds.   If the plaintiff were suing upon an oral contract wholly executory, tendering performance but alleging no actual performance on his part, a different question would be presented.

3.  FRAUDS, STATUTE OF: sale of personal property: performance: effect.

IV.   Errors are assigned upon the giving of certain instructions.   The grounds of the objections involve the same questions as are discussed in the foregoing divisions, and the claim of error is supported by the same discussion as we have already recited.   What we have already said is decisive of these objections.

We find no error in the record.   The judgment below must therefore be—*Affirmed*.

DEEMER, WEAVER and PRESTON, JJ., concur.